RECEIVED APR - 6 2009
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| LAVELLE MYERS<br>    LA. DOC #229907<br>VS. | CIVIL ACTION NO. 08-1730<br>SECTION P<br>JUDGE DRELL |
| BURL CAIN, WARDEN | MAGISTRATE JUDGE KIRK |

## REPORT AND RECOMMENDATION

*Pro se* petitioner Lavelle Myers filed the instant petition for writ of *habeas corpus* pursuant to 28 U.S.C. §2254 on November 14, 2008. Petitioner is an inmate in the custody of Louisiana's Department of Corrections (LDOC); he is incarcerated at the Louisiana State Penitentiary, Angola. Petitioner attacks his 2002 murder conviction and the life sentence imposed by the Thirty-Fifth Judicial District Court, Grant Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court. For the following reasons it is recommended that the petition be **DISMISSED WITH PREJUDICE**.

### Background

On July 17, 2006 petitioner filed a *pro se* petition for writ

of *habeas corpus* in this Court. Therein he raised six claims[1] for relief including the following,

> The State has erred in not performing the DNA test to evidence that was used at trial after being so ordered by the trial court at the evidentiary hearing as a result of Petitioner's Application for Post-Conviction Relief. As of this date there has been no DNA testing that would prove that the Petitioner is factually innocent of the charge in which he is being held. [<u>Lavelle Myers v. Burl Cain, Warden</u>, No. 1:06-cv-1207 at rec. doc. 1-3, pp. 8-9[2]]

---

[1] Petitioner presented five numbered claims, but one of the numbered claims raised separate issues. Thus, the first five claims that petitioner presented were as follows: (1) the trial court erred when it determined the issue of mental capacity by relying on the written reports of the sanity commission; (2) the trial court erred when it refused to instruct the jury as to the penalty for the responsive verdict of manslaughter; (3) the indictment was a nullity because the trial court hand-picked the grand jury foreperson; (4a) ineffective assistance of counsel; (4b) improper allocation of the burden of proof with regard to the issue of sanity.

[2] According to the exhibits tendered by petitioner in support of his first petition for writ of *habeas corpus* in February 2004, petitioner's attorney filed a "Motion for Testing Evidence" on behalf of petitioner claiming that petitioner "was denied a fair trial due to the lack of having evidence analyzed..." [<u>Myers v. Cain</u>, 1:06-cv-1207 at rec. docs. 1-5, pp 2-3]

In May of the same year petitioner filed a *pro se* application for post-conviction relief; while that was pending in the District Court, petitioner's attorney advised him that the motion for testing had been filed and was pending. Therefore, in September 2004 petitioner submitted a Supplemental Memorandum to the District Court. Therein he argued a single supplemental claim, "The results of DNA testing performed pursuant to an application granted under Article 926.1 proves by clear and convincing evidence that Petitioner is factually innocent of the crime for which he was convicted." [*Id.*, rec. doc. 1-5, pp. 43-54 , at 49] Petitioner further argued, "... DNA testing of the 7 items of evidence would support his contention, thus, excluding him as a suspect in the killing of his brother." [*Id.*, at p. 51]

Ultimately, on November 4, 2004, a hearing was convened and counsel was appointed to represent petitioner. Petitioner provided a copy of the transcript of that hearing as an exhibit to his original petition for *habeas corpus*. [*Id.*, rec. doc. 1-6, pp. 1-23] At the conclusion of the hearing, the state judge ordered forensic DNA testing for "'suspected hair found in victim's hand' under Item #18 and further granted as to one sealed packet containing one pair of cam gloves as Item #26, and one sealed packet containing greenish latex glove with possible blood and hair in Item #27, and one sealed packet containing one greenish latex glove in Item #37...'" [*Id.*, rec. doc. 1-6, p. 32]

According to petitioner's original petition for *habeas corpus*, notwithstanding

2

On August 16, 2006 the undersigned authored a Report recommending dismissal of Claims 2 (jury instruction, penalty for manslaughter), 3 (selection of grand jury foreperson) and 4(b) (presumption of sanity) as unexhausted but procedurally defaulted; the undersigned further recommended dismissal of Claims 1 (capacity to proceed) and 4(a)(ineffective assistance of counsel) on the merits. [Myers v. Cain, No. 1:06-cv-1207 at rec. doc. 4]

However, with regard to the DNA claim the undersigned noted, "With regard to Claim 5 (DNA testing), this claim raises an issue not directly related to petitioner's conviction. Here, petitioner seeks merely to enforce the November 4, 2004 order of the Thirty-Fifth Judicial District Court." Myers v. Cain, No. 1:06-cv-1207, rec. doc. 4, p. 17 at footnote 4. The undersigned then concluded:

> As shown above, petitioner's final claim for relief remains unexhausted because petitioner has never subjected the State's failure to comply with the Thirty-Fifth Judicial District Court's order to conduct DNA testing to <u>any</u> level of review by <u>any</u> of the courts of Louisiana.
>
> As noted, the Thirty-Fifth Judicial District Court ruled, '... that the Supplemental Claim for Post Conviction Relief regarding DNA testing is granted with regards to the 'suspected hair found in victim's hand' under Item #18 and further granted as to one sealed packet containing one pair of camo gloves as Item #26, and one sealed packet containing greenish latex glove with possible blood and hair in Item #27, and one sealed packet containing one greenish latex glove in Item #37...' The court further ordered that the

---

the trial court's order, the testing had not been accomplished by the time petitioner filed his federal *habeas* petition.

testing be conducted by the appropriate crime laboratory and paid for by the DNA Testing Post-Conviction Relief for Indigents Fund as provided by La.C.Cr.P. art. 926.1(K). [doc. 1-6, pp. 32-33]

Petitioner contends that the State of Louisiana has not yet complied with this order of the Thirty-Fifth Judicial District Court. [doc. 1-3, p. 18] He asks this court to order the testing which has already been ordered by the State district court.

Petitioner must first seek enforcement of the district court's order in the courts of Louisiana. A number of avenues are available to him – he might consider requesting the District Court to enforce its own order; or, should that fail, he might seek the supervisory jurisdiction of the court of appeals and the Louisiana Supreme Court. In any event, until such time as he shows either the exhaustion of such state court remedies, or the absence of such remedies, this court may not grant him the relief he seeks.

The undersigned is unable to determine whether or not this claim would be procedurally barred in the Louisiana Courts and therefore, dismissal of this claim should be without prejudice to petitioner's right to re-urge this claim upon the exhaustion of available remedies. [Myers v. Cain, No. 1:06-cv-1207, rec. doc. 4, pp. 28-30]

Myers responded to the Report and conceded his failure to exhaust various claims and their status as being subject to dismissal as procedurally defaulted. He indicated his desire to return to the Louisiana courts to conclude the litigation of the DNA testing issue in order to establish his actual innocence. [Myers v. Cain, No. 1:06-cv-1207, at rec. doc. 5]

On August 29, 2006 the Court adopted the Report and Recommendation and dismissed with prejudice Claims 1-4; Claim 5, the DNA testing claim, was dismissed without prejudice. [Myers v.

4

Cain, No. 1:06-cv-1207, rec. doc. 6] Petitioner did not appeal.

At some point, the evidence was subjected to forensic DNA testing at the North Louisiana Criminalistics Laboratory and on March 29, 2007 a hearing was convened in the Thirty-Fifth Judicial District Court. At the hearing, Connie Brown, a technician with the North Louisiana Crime Lab testified as to the results of the testing. According to Ms. Brown, the testing of all but one of the items submitted proved either inconclusive or, confirmed the presence of DNA from the victim and/or the petitioner; with respect to the latex glove discovered in the home of the victim and the petitioner, a swab of the interior of the glove established the presence of DNA from an as-yet unidentified individual who was neither the victim nor the petitioner. [1:08-cv-1730 at rec. doc. 1-4, Exhibit D] More specifically, she testified,

> There were two green latex gloves, item 27 and item 37. Item 27 was a green latex glove that was recovered from the dumpster where John Coleman's [victim] head was found...
>
> And item 37 was a green glove recovered from the residence of John Coleman and Lavelle Myers. The green glove that was found in the dumpster, item 27-T-1, provided a DNA profile that was consistent with being a mixture of DNA from at least two individuals. John Coleman and Lavelle Myers cannot be excluded as the donors of the DNA in this mixture... approximately 97.2 percent of the population can be excluded as the donors of the DNA in this mixture...
>
> Thirty-seven, a swab from the interior of that item, which is the green glove that was found in the residence was inconsistent with the DNA profiles from

5

the reference samples of John Coleman and Lavelle
Myers, therefore John Coleman and Lavelle Myers were
excluded as the possible donors of the DNA. So a DNA
profile that did not match the reference samples of
Lavelle Myers and John Coleman was collected from the
interior of the glove found at the house...

[And the DNA obtained from the inside of the glove was]
most likely sweat. I swabbed the inside of ... these
were dishwashing gloves...

And so swabbing the inside of that glove trying to, to
pick up who's been wearing the glove, so the one glove
that had John Coleman and Lavelle Myers on the inside
of it. This one from the house has some unknown male
individual.... [1:08-cv-1730 at rec. doc. 1-4, Exhibit
D, pp. 69-70]

Ms. Brown was asked one last question on direct examination, "So in your assessment of all these various bits of evidence not only the original for trial purposes, but for this post conviction relief application, is item 37 the only one that you found that was not consistent with either John Coleman or Lavelle Myers' DNA?" To which she replied, "That is correct." [1:08-cv-1730, *Id.*, p. 70]

Under cross-examination she opined that the glove found in the dumpster (Item 27) was a right hand glove and that the glove found in the home (Item 37) was the "corresponding left hand." [*Id.*, p. 72] She continued, "Also worth noting, the unknown individual whose DNA was on the glove from the home was not observed in the glove recovered from the dumpster... [1:08-cv-1730 *Id.*, p. 73] From this fact she concluded that the unknown individual never wore the right hand glove which was found in the

6

dumpster with the victim's severed head. [1:08-cv-1730, *Id.*, p. 74]

On April 13, 2007 the trial court, which had taken the matter under advisement, authored Reasons for Judgment denying relief. The court summarized the evidence and rendered a decision as follows:

> Testifying was Ms. Connie Brown of the North Louisiana Criminalistics Laboratory, her testimony was that as to item described as No. 18, a hair found on the victim's hand, that no DNA testing was possible. That as to item No. 26, a pair of camouflage hunting gloves, one glove showed no DNA results and the other glove showed the DNA of John Coleman, the victim. As to item No. 27, a green latex glove found in the trash dumpster, where the victim's head was located, revealed DNA of both the defendant and the victim. As to item No. 37, a green latex glove, commonly a dishwashing glove, found in the residence where the crime occurred and contained DNA of some unidentified person.
>
> The defendant now claims that this DNA found from another source proves his innocence.
>
> This Court disagrees. The only conclusion from item No. 37 that can be logically made is that someone other than the defendant and the victim washed dishes at sometime at that location. Lavelle Myers has failed to meet his burden of proof that the DNA in the green latex dishwashing glove is clearly contrary to the findings of the jury. [1:08-cv-1730 at rec. doc. 1-4, Exhibit E, pp. 90-93]

On May 14, 2007 petitioner filed an application for writs in the Third Circuit Court of Appeals. On September 19, 2007, the Third Circuit denied writs noting, "There was no error in the trial court's ruling. Moreover, Relator did not file a motion for new trial based on newly discovered evidence. See La. Code Crim.P.

arts. 851-854. Accordingly, Relator's writ is denied. <u>State of Louisiana v. Lavelle Myers</u>, KH 07-00591 at 1:08-cv-1730, rec. doc. 1-4, Exhibit F, p. 95.

On some unspecified date petitioner sought review in the Louisiana Supreme Court and on August 29, 2008 his writ was denied without comment. <u>State of Louisiana ex rel. Lavelle Myers v. State of Louisiana</u>, 2007-2130 (La. 8/29/2008), 989 So.2d 92.

The instant *habeas* petition, which was filed on November 14, 2008, raises a single claim for relief,

> Petitioner was denied due process and/or equal protection of the law when state courts below denied him post-conviction relief on DNA claim. [1:08-cv-1730, rec. doc. 1¶5(a)][3]

Elsewhere petitioner frames the issue before the Court as follows,

> Has Petitioner been denied due process and/or equal protection of the law ... by the State courts below, by denying petitioner a new trial based upon DNA test results which prove Petitioner's long-standing contention that someone else was at the scene of the crime? [1:08-cv-1730 at rec. doc. 1-3, p. 7]

Finally, petitioner argues that the Louisiana courts

> ... didn't take into consideration the fact that the DNA test result of Item #37 (left handed, green latex glove) provided an 'articulable doubt' as to Petitioner's guilt. While it may be argued that the DNA

---

[3] Petitioner's petition is not second and successive under the AEDPA since the claim advanced herein was earlier dismissed without prejudice. <u>In re Gasery</u>, 116 F.3d 1051, 1052 (5th Cir.1997) ("[A] *habeas* petition refiled after dismissal without prejudice ... is merely a continuation of [petitioner's] first collateral attack, not a 'second or successive' petition within the meaning of § 2244(b).").

results in and of itself – that the DNA trace evidence excluded both the victim and Petitioner – does not unequivocally prove Petitioner's innocence, it is a scientific fact that was not heard by the jury that determined Petitioner's guilt. [1:08-cv-1730, *Id.*, p. 8]

### *Law and Analysis*

In his original petition for writ of *habeas corpus* filed in 2006, petitioner argued his claim for relief as follows:

> The State has erred in not performing the DNA test to evidence that was used at trial after being so ordered by the trial court at the evidentiary hearing as a result of Petitioner's Application for Post-Conviction Relief. As of this date there has been no DNA testing that would prove that the Petitioner is factually innocent of the charge in which he is being held. [Lavelle Myers v. Burl Cain, Warden, No. 1:06-cv-1207 at rec. doc. 1-3, pp. 8-9]

In the original Report and Recommendation, the undersigned expressed some concern over whether this claim was an appropriate *habeas corpus* claim. In fact, as shown above, the undersigned noted, "With regard to Claim 5 (DNA testing), this claim raises an issue not directly related to petitioner's conviction. Here, petitioner seeks merely to enforce the November 4, 2004 order of the Thirty-Fifth Judicial District Court." Myers v. Cain, No. 1:06-cv-1207, rec. doc. 4, p. 17 at footnote 4.

Nevertheless, since petitioner implied that the results of the DNA testing would ultimately establish his "actual innocence," the undersigned encouraged petitioner to return to the state court's to obtain enforcement of the order directing additional forensic testing.

9

Petitioner has now obtained the relief he sought in the State post-conviction process - the State trial court's order directing further testing has been fully complied with, and, petitioner was afforded an evidentiary hearing with regard to the relative significance of this new evidence. Thus, to the extent that petitioner complained about the State's refusal to comply with the trial court's order, his claim is moot.

Further, to the extent that petitioner maintains that he was denied due process and equal protection in the adjudication of his post-conviction claims, he fails to state a claim for which relief may be granted. The Fifth Circuit has repeatedly held that defects in state post-conviction proceedings are not cognizable under 28 U.S.C. §2254. See Rudd v. Johnson, 256 F.3d 317, 319-20 (5th Cir.), *cert. denied*, 121 S.Ct. 477 (2001) noting in turn, Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir.) quoting, Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir.1997)("... infirmities in state *habeas* proceedings do not constitute grounds for relief in federal court..."); *cert. denied*, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir.1995)("An attack on a state *habeas* proceeding does not entitle the petitioner to *habeas* relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself."); Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir.1992); Millard v. Lynaugh,

810 F.2d 1403, 1410 (5th Cir.1987); see also <u>Vail v. Procunier</u>, 747 F.2d 277, 277 (5th Cir.1984)("[i]nfirmities in state *habeas corpus* proceedings do not constitute grounds for federal *habeas* relief.").

Further, to the extent that petitioner contends that he is entitled to federal *habeas corpus* relief pursuant to §2254 based on his claim of actual innocence, he also fails to state a claim for which relief may be provided. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceeding ... This rule is grounded in the principle that federal *habeas* courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." <u>Herrera v. Collins</u>, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Actual innocence claims provide instead, "a gateway through which a *habeas* petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404, 113 S.Ct. 853.

This is an evolving area of law, however, and the possibility exists that at some point in the not too distant future, the jurisprudence will recognize that the continued incarceration of an innocent inmate is violative of the Constitution or laws of the United States. In <u>Herrera v.</u>

11

Collins,, *supra*, for example, the Supreme Court assumed, for the sake of argument, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal *habeas* relief if there were no state avenue open to process such a claim." 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Whether a stand-alone claim of actual innocence is in fact justiciable is a question the Supreme Court has thus far "decline[d] to resolve," House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 2087, 165 L.Ed.2d 1 (2006).

Further, federal *habeas* courts must construe *pro se* petitions liberally. Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Perez v. United States, 312 F.3d 191, 194-95 (5th Cir.2002). Thus, read liberally, petitioner's current petition might be interpreted as arguing actual innocence as a gateway to permit litigation of his previously procedurally defaulted claims.

Therefore, in deference to petitioner's plight, and in recognition of both evolving legal principals and the fact that petitioner's claims were previously dismissed as procedurally defaulted, it seems appropriate to discuss petitioner's claim of actual innocence under the guidelines suggested by the United States Supreme Court in Schlup v. Delo, 513 U.S. 298, 299, 327-28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In Schlup, the Supreme

Court held that in order for a *habeas* petitioner to make a true showing of actual innocence he must (1) present new reliable evidence, (whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence); (2) that was not presented at trial; and (3) he must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.

The only evidence submitted by petitioner to establish his claim of actual innocence is the forensic testing of the latex glove discovered in the house shared by him and his brother, the victim. As noted above, that item of evidence, when subjected to DNA testing, revealed the presence of a third party's DNA on the interior of the glove. Thus, the scientific evidence establishes that someone, other than the petitioner or the victim, wore that glove at some undetermined point in time. This evidence satisfies the first two requirements of Schlup, since it is reliable scientific evidence that was not presented at trial.

However, it is clear beyond any doubt that petitioner is unable to surmount the third hurdle erected by Schlup – for he cannot show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt had the jury been privy to this newly obtained scientific evidence.

In other words, in order to establish actual innocence under Schlup, petitioner must demonstrate that, "in light of all the

13

evidence," "it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327-28, 115 S.Ct. 851. In making these determinations, this Court cannot substitute its own judgments as to whether there is a reasonable doubt; the Schlup standard requires instead that the Court "make a probabilistic determination about what reasonable, properly instructed jurors would do." Id. at 329, 115 S.Ct. 851. Further, this "... analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." Id. at 328, 115 S.Ct. 851. Since the issue of actual innocence is presented on collateral review, following conviction, the *habeas* Court is not bound by the rules of evidence that govern a trial; in other words, "[t]he *habeas* court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted ... and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Id. at 328, 115 S.Ct. 851.

Again, the ONLY evidence submitted in support of petitioner's claim of actual innocence is the presence of an unknown third-party's DNA inside a latex glove that was otherwise unlinked to the crime. This evidence does not make it more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. A reasonable juror

14

could certainly have concluded, as did the State Court judge, "... that someone other than the defendant and the victim washed dishes at sometime at that location...." and found the petitioner guilty in light of the overwhelming circumstantial and scientific evidence that was ultimately introduced at trial.[4] Petitioner

---

[4] Of course, this matter remains on initial review at this time; the respondent has not been served, nor has the complete trial record been produced. Nevertheless, at no time in this or in the preceding *habeas* action, has petitioner challenged the accuracy of the statement of the case provided by the Court of Appeals in their opinion on direct review. That Court determined that the trial record established the following:

> The defendant and the victim, John Coleman, are brothers, and, on May 20, 2001, they were living together in a house trailer located north of Pollock, Louisiana, in Grant Parish. At approximately 3:30 p.m. on that day, three parish law enforcement officers went to the trailer to investigate a report that a corpse had been found in the residence. Upon arrival, they found no evidence of forced entry into the residence and discovered the victim's decapitated body lying in a bathtub. Not only had his head been severed from his torso, but his genitalia had been severed as well. The victim's body appeared to have been washed, as there was very little blood in the bathtub. The investigating officers subsequently discovered the severed genitalia beneath the victim's left leg, but they did not find the severed head at the scene.
>
> Grant Parish Sheriff's Detective Jody Bullock collected blood samples in the bathroom where the victim's body was located, in the hall leading from the bathroom to the victim's bedroom, and in the bedroom itself. While examining the bedroom, Detective Bullock initially observed that the bed appeared to be made up. However, when he removed the top cover, he found that the bed contained no linens.
>
> Detective Bullock then lifted the mattress on the bed and observed blood stains on the underneath side as if it had been "flipped" over. Additionally, he observed blood splatters on the bedroom window blinds and collected a spent .22-caliber shell casing from the bedroom floor. During the course of his investigation, Detective Bullock walked to the defendant's bedroom where he discovered a loaded Marlin .22-caliber rifle behind the bedroom door. According to Detective Bullock, the rifle appeared to have been wiped clean, but a closer inspection revealed what appeared to be blood splatters on the lens of the scope mounted on the rifle. Subsequent scientific testing established that the blood found on the scope of the rifle matched that of the victim and that the spent .22-caliber shell found in the victim's bedroom had been fired from the Marlin .22-caliber rifle found in the defendant's bedroom.

15

Two days later, on May 22, 2001, Detective Bullock recovered the victim's severed head from a dumpster near Georgetown, Louisiana. The victim had been shot twice in the head at close range by a small-caliber weapon. Additionally, he recovered, from the dumpster, a pillow and sheets with substantial amounts of blood on them, as well as some underwear and socks.

The defendant was present at the trailer when the deputies arrived on May 20. On that day, he gave two separate statements to the members of the investigating team. At approximately 4:26 p.m., the defendant gave a statement to Grant Parish Sheriff Deputy John T. Montgomery, one of the first deputies to arrive on the scene. Deputy Montgomery testified concerning the fact that he took the statement, but did not elaborate on its content. At 11:00 p.m., Deputy Montgomery and Detective Bullock questioned the defendant a second time. <u>According to Detective Bullock, in this statement, the defendant asserted that he and his brother had been involved in a physical altercation sometime during the day and that the defendant had struck the victim, rendering him unconscious. Detective Bullock testified that the defendant informed him that he then panicked and telephoned unidentified individuals to come and "fix his problem." Initially, the defendant suggested that he agreed to pay the unnamed individuals $1,000.00, but later in his statement, it became unclear whether he agreed to pay anything. In any event, the defendant was unable to provide the officers with names or telephone numbers of the alleged individuals. Detective Bullock testified that after the statement, he urged the defendant to tell the truth. According to the detective, the defendant responded that he would if he could be guaranteed that he would be placed in a mental hospital.</u>

When the deputies first arrived at the trailer on May 20, <u>Johnny W. Moss, a step-cousin to the defendant and his brother, was also present. He testified that he had been called by the defendant to come to the trailer and that, when he arrived, the defendant informed him that the victim was in the bathtub. Mr. Moss was aware that the defendant and his brother had quarreled regularly before the May 20 homicide. According to Mr. Moss, the victim had recently told him that he wanted the defendant to move out. On another occasion, according to Mr. Moss, the defendant had stated that if the victim "didn't let him alone, he was going to cut his head off."</u>

The state presented evidence of two other incriminating statements made by the defendant after his arrest for his brother's murder. The first occurred on October 2, 2001, when Sergeant Chris Woodard of the Grant Parish Sheriff's Office allowed a trustee to take a juvenile for a tour of the jail in an effort to impress upon the juvenile the consequences of criminal behavior. Sergeant Woodard trailed behind the trustee and the juvenile, and, <u>as they approached the defendant's cell, the trustee asked the defendant to tell the juvenile why he was incarcerated. According to Sergeant Woodard, the defendant responded that he had cut off a man's head and genitals.</u>

The other statement was made to Johnny Ray Desselle, who shared a

16

has failed to establish that his "new scientific evidence," if presented to a jury, would have resulted in a verdict contrary to the guilty verdict which he now attacks and therefore, his claim of "actual innocence" whether considered as a stand-alone claim for *habeas* relief, or as a gateway warranting consideration of his previously procedurally defaulted claims is patently without merit.

Accordingly, and for all of the foregoing reasons,

**IT IS RECOMMENDED** that this petition for *habeas corpus* be **DENIED AND DISMISSED WITH PREJUDICE.**

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this**

---

cell in the parish jail with the defendant for a period of time before trial. According to Mr. Desselle, the defendant told him that he and his brother had gotten into an altercation over some checks he had written for crack cocaine and that the victim had wanted him to move from the trailer. <u>Mr. Desselle testified that the defendant told him that he had shot his brother as he lay in bed and that he had dragged the body to the bathtub where he "cut him like he did a deer."</u>

Myers, 839 So.2d 1185-87(emphasis supplied)

Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See, <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).

In Chambers, Alexandria, Louisiana, April 3, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE